IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE

| | | |
|---|---|---|
| KAREEM KINSLOW, | : | |
| Plaintiff, | : | Civil No. 22-3414 (RBK) |
| v. | : | **OPINION** |
| COMMISSIONER OF SOCIAL SECURITY, | : | |
| Defendant. | : | |

**KUGLER**, United States District Judge:

This matter comes before the Court on the appeal filed by Plaintiff Kareem Kinslow from the decision of the Commissioner of the Social Security Administration (the "Commissioner") denying Plaintiff disability insurance benefits and supplemental security income. For the reasons set forth below, the Commissioner's decision is **VACATED** and **REMANDED** for proceedings consistent with this Opinion.

**I.     PROCEDURAL HISTORY**

On March 18, 2020, Kinslow filed applications with the Social Security Administration (the "Administration") for disability insurance benefits and supplemental security income, alleging he became disabled on December 10, 2019. (R. at 66–67). The Administration initially denied Kinslow's claims on August 20, 2020. (*Id.*). It denied them on Reconsideration on December 24, 2020. (*Id.* at 116, 121). On February 12, 2021, Kinslow requested a hearing before an administrative law judge ("ALJ"). (*Id.* at 128). Represented by counsel, Kinslow appeared before the ALJ on October 13, 2021 for a telephonic hearing. (*Id.* at 23, 37). On October 22, 2021, the ALJ found that Kinslow was not disabled within the meaning of the Social Security

1

Act. (*Id.* at 37). Kinslow appealed the ALJ's decision to the Appeals Council, which denied Kinslow's request for review on January 25, 2022. (*Id.* at 9–14). On June 3, 2022, Kinslow appealed the matter to this Court. (ECF No. 1).

## II.    LEGAL STANDARD

### A.    Sequential Evaluation Process

The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Commissioner uses an established five-step evaluation process to determine whether a claimant is disabled. *See* 20 C.F.R. § 404.1520.

For the first four steps of the evaluation process, the claimant has the burden of establishing her disability by a preponderance of the evidence. *Zirnsak v. Colvin*, 777 F.3d 607, 611–12 (3d Cir. 2014). First, the claimant must show that she was not engaged in "substantial gainful activity" for the relevant time period.  20 C.F.R. § 404.1572. Second, the claimant must demonstrate that she has a "severe medically determinable physical and mental impairment" that lasted for a continuous period of at least twelve months. 20 C.F.R. § 404.1520(a)(4)(ii); 20 C.F.R. § 404.1509. Third, either the claimant shows that her condition was one of the Commissioner's listed impairments, and is therefore disabled and entitled to benefits, or the analysis proceeds to step four. 20 C.F.R. § 404.1420(a)(4)(iii). Fourth, if the condition is not equivalent to a listed impairment, the ALJ must assess the claimant's residual functional capacity ("RFC"), and the claimant must show that she cannot perform her past work. 20 C.F.R. § 404.1520(a)(4)(iv); 20 C.F.R. § 404.1520(e). If the claimant meets her burden, the burden then shifts to the Commissioner for the last step. *Zirnsak*, 777 F.3d at 612. At the fifth and final step,

the Commissioner must establish that other available work exists that the claimant can perform based on her RFC, age, education, and work experience. 20 C.F.R. § 404.1520 (a)(4)(v); *Zirnsak*, 777 F.3d at 612. If the claimant can make "an adjustment to other work," she is not disabled. *See* 20 C.F.R. § 404.1520(a)(4)(v).

### B.     Review of the Commissioner's Decision

This Court reviews the ALJ's application of the law *de novo* and the ALJ's factual findings under a "substantial evidence" standard. *Poulos v. Comm'r of Soc. Sec.*, 474 F.3d 88, 91 (3d Cir. 2007) (citing 42 U.S.C. 405(g); *Williams v. Sullivan*, 970 F.3d 1178, 1182 (3d Cir. 1992); *Mounsour Med. CR. v. Heckler*, 806 F.3d 1185, 1191 (3d Cir. 1986)).

Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Morales v. Apfel*, 225 F.3d 310, 316 (3d Cir. 2000). Substantial evidence is "more than a mere scintilla but may be somewhat less than a preponderance of the evidence." *See*, *e.g.*, *Rutherford v. Barnhart*, 399 F.3d 546, 552 (3d Cir. 2005) (quoting *Ginsburg v. Richardson*, 436 F.2d 1146, 1148 (3d Cir. 1971)). Courts may not set aside the Commissioner's decision if it is supported by substantial evidence, even if this Court "would have decided the factual inquiry differently." *Fargnoli v. Massanari*, 247 F.3d 34, 38 (3d Cir. 2001).

When reviewing a matter of this type, this Court must be wary of treating the determination of substantial evidence as a "self-executing formula for adjudication." *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983). This Court must set aside the Commissioner's decision if it did not take into account the entire record or failed to resolve an evidentiary conflict. *See Schonewolf v. Callahan*, 972 F.Supp. 277, 284–85 (D.N.J. 1997) (citing *Gober v. Matthews*, 574 F.2d 772, 776 (3d Cir. 1978)). Evidence is not substantial if "it really constitutes

not evidence but mere conclusion," or if the ALJ "ignores, or fails to resolve, a conflict created by countervailing evidence." *Wallace v. Sec'y of Health & Human Servs.*, 722 F.2d 1150, 1153 (3d Cir. 1983) (citing *Kent*, 710 F.2d at 110, 114). A district court's review of a final determination is a "qualitative exercise without which our review of social security disability cases ceases to be merely deferential and becomes instead a sham."  *Kent*, 710 F.2d at 114.

### III.     FACTUAL BACKGROUND

#### A.     Plaintiff's History

Kinslow was born on September 1, 1993. (R. at 189). He graduated from college with a bachelor's degree and previously worked as a residential counselor. (*Id.* at 229, 857). As it pertains to this case, Kinslow alleges his troubles began on December 10, 2019, when police attempted to pull him over for driving while intoxicated, and Kinslow subsequently attempted suicide by cop. (*Id.* at 307, 311, 320).

From December 10, 2019 to August 16, 2021, Kinslow was in-and-out of several mental health treatment facilities and at least one criminal justice facility for varying lengths of time. (*See* ECF No. 11, Plaintiff's Brief, "Pl. Brief" at 6–8 and record cites therein). To begin, following the December 10 suicide attempt, Kinslow was hospitalized for about one week, then spent three months in jail. (R. at 600, 857). Following his release, he was placed on house arrest. (*Id.* at 885). One of his house arrest conditions was apparently an order not to work. (*Id.* at 1144). His house arrest ended sometime in or shortly before August 2021. (*Id.* at 1845).

During that period, he spent time in and out of numerous treatment facilities and programs: Kinslow spent time in a partial care program at Oaks Integrated Care from April 8, 2020 to April 24, 2020, (*Id.* at 619–53); a dual intensive outpatient program at Hampton Behavior Health Center from April 13, 2020 to April 30, 2020, (*Id.* at 654–88, 1416–99); on and

4

off at another partial care program at Oaks Integrated Care from May 26, 2020 to December 15, 2020, (*Id.* at 875–945, 1319–1415); an inpatient treatment program at Virtua Willingboro Hospital for two days in June 2020 following another suicide attempt, (*Id.* at 824–40); an involuntary inpatient hospitalization at Hampton Behavioral Health Center from November 15, 2020 to December 1, 2020, (*Id.* at 949–1310); an inpatient hospitalization at Kairos House from December 1, 2020 to December 20, 2020, (*Id.* at 1311–18); a partial hospitalization–intensive outpatient program with Princeton House Behavioral Health from December 3, 2020 to March 25, 2021, (*Id.* at 2172–2255); various treatments again with Oaks Integrated Care from March 25, 2021 to September 14, 2021, (*Id.* at 1575–2110); a medication management program with Catholic Charities from July 2, 2021 until at least his ALJ hearing date, (*Id.* at 2130–49); an involuntary outpatient commitment program with Legacy Treatment Services from July 30, 2021 until at least his hearing date, (*Id.* at 2128–29, 2150–71); and a brief, 2-day hospitalization in August 2021 following a seizure at Virtua Willingboro Hospital, (*Id.* at 1504–74).

### B.    The ALJ's Decision

At step one, the ALJ found that Kinslow had not engaged in substantial gainful activity since Kinslow's alleged onset date, December 10, 2019. (*Id.* at 25). At step two, the ALJ found that Kinslow suffered from four severe impairments: major depressive disorder, generalized anxiety disorder, post-traumatic stress disorder (PTSD), and alcohol abuse, which the ALJ noted was not material to her decision. (*Id.* at 25–26). The ALJ found that these impairments significantly limited Kinslow's ability to perform a full range of basic work-related activities and lasted for more than twelve months. (*Id.* at 25–26). At step three, the ALJ found that none of Kinslow's four severe impairments met or medically equaled the severity of any listed impairment under 20 CFR Part 404, Subpart P, Appendix 1. (*Id.* at 26). Specifically, the ALJ

found that "considered singly or in combination, [Kinslow's severe impairments] do not meet or medically equal the criteria of listing 12.04, 12.06, and 12.15." (*Id.* at 26). The ALJ further found that Kinslow had moderate limitations in all four functioning factors: understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; and adapting or managing oneself. (*Id.* at 26–27).

At step four, the ALJ formulated Kinslow's RFC. (*Id.* at 27–35). The ALJ found that Kinslow "has the residual function capacity to perform a full range of work at all exertional levels but with the following non-exertional limitations: can perform simple, repetitive tasks on a continuous basis with simple instructions and decisions, in a low stress work environment. No assembly line or production rate pace work. Can occasionally interact with others in the workplace. No customer service work. Able to tolerate occasional changes in the work setting and work processes." (*Id.* at 27). The ALJ explained that Kinslow's "statements concerning the intensity, persistence and limiting effects of these symptoms are not fully supported [by the record]. [Kinslow]'s mental impairments are severe and accounted for in the RFC but not work preclusive." (*Id.* at 28–29).

The ALJ noted that she considered many different parts of the record during her analysis. To begin, the ALJ said she "considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence [in the record]" as well as "the medical opinion(s) and prior administrative medical finding(s)." (*Id.* at 27). The ALJ also considered treatment notes from each of Kinslow's many treatments listed above, (*id.* at 29–33), and psychiatric treatment notes from September 2021, (*id.* at 33–34).

Additionally, the ALJ considered an opinion letter from August 2021 written by psychiatrist Dr. Hatice Burakgazi Yilmaz. (*Id.* at 34). Although the letter said that Dr. Yilmaz

6

would support a disability claim, the ALJ found the letter unpersuasive because "the ultimate issue of disability is a medical-vocational determination reserved for the Commissioner" and "Dr. Yilmaz's treatment notes . . . do not support this degree of disability." (*Id.* at 34). The ALJ noted, "Although [Kinslow] is engaged with court ordered therapy that may reduce the hours[] he would be available to work, there is no indication in the letter that this course of treatment will be maintained for 12-consecutive months. In addition, Dr. Yilmaz did not provide an assessment noting [Kinslow]'s work-related abilities and/or limitations." (*Id.* at 34). Finally, the ALJ considered that multiple treatment notes say Kinslow could have worked during this time if the court allowed him to, and that the findings of the State agency consultants—who found no exertional limitations on Kinslow—were persuasive. (*Id.* at 34). As such, the ALJ wrote, "the objective evidence does not demonstrate the existence of limitations of such severity as to have precluded [Kinslow] from performing all work on a regular and continuing basis at any time from the alleged onset date of disability." (*Id.* at 34–35).

After constructing the RFC, the ALJ concluded step four by finding that Kinslow is unable to perform any past relevant work. (*Id.* at 35). At the fifth and final step, based on all the above as well as testimony from a vocational expert, the ALJ found that, based on Kinslow's age, RFC, education, and prior work experience, there are jobs that exist in significant numbers in the national economy that Kinslow can perform. (*Id.* at 35–36). In particular, the ALJ found that Kinslow could perform the functions of a collator operator, photocopy machine operator, and document preparer. (*Id.* at 36). Accordingly, the ALJ concluded that Kinslow was not disabled. (*Id.* at 36).

## IV.   DISCUSSION

Kinslow presents four arguments for reversal: (1) the ALJ's RFC finding is not supported by substantial evidence because she failed to properly account for Kinslow's frequent hospitalizations and intensive outpatient care; (2) the ALJ found Dr. Yilmaz's letter unpersuasive for erroneous reasons; (3) the ALJ erred during her Step Three analysis when she found that Kinslow's impairments did not meet the Listing of Impairment's requirements; and (4) the ALJ failed to include all of Kinslow's credibly established limitations in her RFC and the hypotheticals she presented to the testifying vocational expert. (Pl. Brief at 5).

We begin and end with Kinslow's first argument: that the ALJ's RFC finding is not supported by substantial evidence because she failed to properly account for Kinslow's frequent and various treatments, including intermittent inpatient hospitalizations, inpatient treatment programs, and intensive outpatient treatment. We agree with Kinslow that the ALJ failed to properly account for the absences Kinslow's treatment would cause if he returned to the workforce.

The most notable facts in the record on this point come from the transcript of the October 13, 2021 administrative hearing the ALJ held with Kinslow, Kinslow's counsel, and a vocational expert before rendering her decision. (R. at 43–61). Toward the end of that hearing, after hearing testimony from Kinslow himself, the ALJ questioned the vocational expert by posing two hypothetical questions. (*Id.* at 58–60). First the ALJ asked:

> [A]ssume a hypothetical individual the same age, education and work experience as the Claimant [Kinslow] with the residual functional capacity to perform a full range of work with no exertional limitations. The hypothetical individual retains the ability to carry out simple/routine tasks on a continuous basis with simple instructions and simple/work-related decisions in a low-stress work environment; no assembly line or production rate pace work; occasional interaction with co-workers and supervisors; no customer service work; tolerate occasional changes in the work setting and work processes. Could such a hypothetical individual perform

8

>the Claimant's past work as performed or as generally performed in the national economy?

(*Id.* at 58). The expert answered that, no, such an individual could not. (*Id.* at 58). The ALJ then asked the expert if there were other jobs that "exist in significant numbers that such a hypothetical individual could perform given those limitations?" (*Id.* at 58–59). The expert answered, yes: collator-operator, photocopy machine operator, and document preparer for microfilming. (*Id.* at 59). The ALJ then proposed her second hypothetical:

>"[A]ssume a hypothetical individual the same age, education and work experience as the Claimant with the residual functional capacity to perform a full range of work, with the same non-exertional limitations as those in hypothetical number one, but **with the additional limitation that the hypothetical individual would be absent two days a month**. Are there jobs that would exist in significant numbers?

(*Id.* at 59) (emphasis added). The expert answered: no, there are not. (*Id.* at 59). When asked why, the expert responded that the tolerable level of absenteeism "is one day per month; more than one day . . . per month is unacceptable." (*Id.* at 59).

Despite this exchange, and despite Kinslow's constant and consistent inpatient hospitalizations and intensive outpatient treatments since his onset date—court-ordered or otherwise—the ALJ never once recounts or accounts for this exchange in her decision denying Kinslow's claim. We will not argue that the ALJ considered a significant amount of treatment notes and other evidence when formulating Kinslow's RFC as demonstrated by the many pages of single-spaced explanation. (*See id.* at 27–35). But the ALJ denied Kinslow's claim at Step Five when she found that there were jobs that existed in the national economy in significant numbers that Kinslow could perform given, in part, his RFC. (*Id.* at 35–36). Those jobs were the three jobs that the vocational expert testified he believed Kinslow could perform given the first hypothetical presented to him by the ALJ. (*Id.* at 59). But during her RFC analysis, the ALJ did

9

not consider how her questions about absenteeism might impact Kinslow's RFC or his ability to perform jobs that exist in significant numbers in the national economy.

This is especially important for the ALJ to consider given that the vocational expert testified that if an individual with Kinslow's RFC is absent more than one day per month from work, there are no jobs that exist in significant numbers in the national economy that such a person could perform. (*Id.* at 59). Such a finding would necessarily alter the ALJ's final determination about whether Kinslow is disabled and thus entitled to benefits. It is not merely one fact weighed among many. Given the ALJ's other findings at Steps One through Four, it is dispositive. *See Searles v. Comm'r of Soc. Sec.* 2019 WL 6337890, at *6–7 (D.N.J. Nov. 27, 2019) (reversing an ALJ's decision, in part, because the ALJ did not consider the claimant's attendance at mental health treatment when formulating the RFC).

It is true that the law does not require the ALJ to automatically accept the premise of the second hypothetical just because she asked it. *See Pearson v. Comm'r of Soc. Sec.*, 839 F. App'x 684, 690 (3d Cir. 2020). But, as detailed below, the ALJ points to no record evidence, let alone substantial evidence, that Kinslow would not continue to be absent from work more than once per month, and there exists copious record evidence that he would be absent at least twice per month. The ALJ made "mere conclusions" unsupported by record evidence, and she failed to resolve the conflict created by this countervailing evidence of Kinslow's constant need for treatment which would render him absent from work. That is error. *See Wallace v. Sec'y of Health & Human Servs.*, 722 F.2d 1150, 1153 (3d Cir. 1983) (citing *Kent*, 710 F.2d at 110, 114).

If there is anywhere in the ALJ's decision that one could argue she considered this limitation and dismissed it, it is in her discussion of the persuasiveness of Dr. Yilmaz's letter. There, the ALJ says, "Although the claimant is engaged with court ordered therapy that may

reduce the hours[] he would be available to work, there is no indication in the letter that this course of treatment will be maintained for 12-consecutive months." (R. at 34) We do not find, though, that this statement shows the ALJ appropriately considered the absenteeism issue or supported it with substantial evidence. First, the ALJ points to no evidence in the record that Kinslow will not continue his intensive treatment to help manage his serious mental health issues, and, as such, we cannot find that this conclusion is supported by substantial evidence.

Second, while the ALJ pointed to zero evidence that Kinslow can or should stop his treatments, evidence exists in the record to suggest that he should and will continue treatment. In Dr. Yilmaz's letter, the doctor wrote, "Mr. Kinslow has been compliant with his IOC [Involuntary Outpatient Commitment Program] treatment plan and with his current level of functioning **and necessity for mental health treatment** his ability to work is impaired and IOC would support a disability claim at this time." (*Id.* at 2128) (emphasis added). Although the ALJ is correct that a disability determination is a medical-vocational determination reserved for the Commissioner, (*id.* at 34), and that a treating physician's opinion is not dispositive, (*id.* at 29), it still is evidence in the record that shows that a treating doctor believes Kinslow still needs mental health treatment, whether court-ordered or not. It is conflicting evidence that the ALJ is bound by law to resolve. *See Schonewolf*, 972 F. Supp. at 284–85.

And that is not the only evidence in the record. Treatment notes from September 3, 2021—at what appears to be Kinslow's latest treatment program just before his ALJ hearing—recommend follow-up with weekly therapy and medication. (R. at 2137). Another treatment note dated September 15, 2021 recommends admission to the IOC including weekly case management and psychiatric evaluation. (*Id.* at 2154). The ALJ herself noted treatment notes from early-to-mid-2021 that "indicated that treatment was necessary to avoid psychiatric

11

hospitalization." (*Id.* at 32). The ALJ further notes that a "discharge summary from Oaks in July 2021 [indicated] the claimant could perform minimal self-care functions but cannot assume most responsibilities." (*Id.* at 33). The only reasonable inference to draw from this statement is that Kinslow needed further treatment. And so he did. Although Oaks discharged him, Kinslow "was linked to another agency." (*Id.* at 33).

Against that, the ALJ cites to no evidence in the record that Kinslow can or will cease his treatment once it is no longer court ordered. The ALJ only cites to certain parts of the record that claim that Kinslow could apparently return to work once he is off house arrest. We do not discount the ALJ's evaluation of those notes, but merely note that they do not say he will not need further treatment post-house arrest. That is the central issue here. At bottom, the ALJ may weigh record evidence but cannot substitute her lay opinion over the record evidence. *See Morales*, 225 F.3d at 317.

We are not reweighing the evidence here. We are merely noting that evidence exists that absenteeism is an issue for Kinslow. Given the vocational expert's testimony, the ALJ should have considered it during her RFC formulation, but she did not. The ALJ failed to resolve this evidentiary conflict and must now go back and do so. *See Gober*, 574 F.2d at 776.

Therefore, given (1) that there is testimony from a vocational expert that missing more than one day of work per month would mean that there are no jobs that exist in significant numbers in the national economy that someone with Kinslow's RFC could perform, (2) there is substantial evidence in the record of Kinslow's intensive inpatient and outpatient treatment since December 10, 2019, (3) there is no evidence in the record that Kinslow will not need any such treatment moving forward, and (4) there is evidence in the record from treating physicians and other mental health treatment providers that Kinslow requires continued mental health treatment,

12

we find that the ALJ's RFC finding is not supported by substantial evidence. As such, we will remand back to the ALJ to consider how Kinslow's absences from work affect his RFC and what jobs, if any, he could perform that exist in significant numbers in the national economy given his treatment needs and the absences from work they cause. We note that we do not take a position on such a finding, but merely direct the ALJ to properly consider it.

## V.  CONCLUSION

For the foregoing reasons, the Court **VACATES** the ALJ's ruling and **REMANDS** for further administrative proceedings consistent with this Opinion. An appropriate order follows.


Dated: June 6, 2023                                                 /s/ Robert B. Kugler
                                                                                 ROBERT B. KUGLER
                                                                                 United States District Judge